January 17, 1979

## 79-5    MEMORANDUM OPINION FOR THE SECRETARY OF THE INTERIOR

**Administrative Procedure—Rulemaking— Department of the Interior—*Ex Parte* Communications—Consultation with the Council of Economic Advisers—Surface Mining Control and Reclamation Act (30 U.S.C. § 1201 *et seq.*)**

On September 18, 1978, the Office of Surface Mining Reclamation and Enforcement (OSM), acting pursuant to a delegation of authority from you as Secretary of the Interior under the Surface Mining Control and Reclamation Act of 1977, 91 Stat. 445, 30 U.S.C. § 1201 *et seq.* (the 1977 Act), published a notice of a proposed rulemaking in the *Federal Register*. The notice (1) stated that the rulemaking was intended to establish "a nationwide permanent program for the regulation of surface and underground mining operations by the States and the Federal Government as required by" the 1977 Act; (2) set forth the text of proposed rules; (3) announced that public hearings on the rules would be held at certain designated places during October 1978; and (4) invited written or oral comments from the public for a 60-day period ending November 17, 1978.

During the comment period the Regulatory Analysis Review Group (RARG), at the direction of the President, reviewed the proposed rules and submitted a report containing a number of comments. The Council of Economic Advisers (CEA) is an active member of RARG, and it participated in the preparation of this report. After the close of the comment period, the Chairman of CEA and the Assistant to the President for Domestic Affairs and Policy were asked to consider several questions related to the proposed rules. This Office has been asked to consider whether—and pursuant to what limitations—CEA members and staffers may meet with you and members of your OSM staff to discuss in greater detail their concerns about several portions of the rules.

The questions we have been asked are, first, whether there is any statutory or constitutional prohibition against consultations between the Department of the Interior (Interior) and CEA; second, provided that

consultations are appropriate, what are the necessary procedures to insure compliance with the requirements imposed by recent decisions of the U.S. Court of Appeals for the District of Columbia Circuit.

For the following reasons, we conclude that no prohibition against communications within the executive branch after the close of the comment period exists; that nothing in the relevant statutes or in the decisions of the D.C. Circuit Court suggests that full and detailed consultations between parties charged with promulgating the rules and the President's advisers are barred. The rulings of the D.C. Circuit Court, however, suggest that it may be inappropriate for interested persons outside the executive branch to conduct *ex parte* communications with the Secretary and his staff. If that is so, we believe that the D.C. Circuit Court would disapprove of CEA or other advisers to the President serving as a conduit for such *ex parte* communications. In order to prevent CEA from serving as a conduit, we recommended the procedure outlined in detail in the attached letter from this Office to CEA of December 28, 1978. We have concluded that by adhering to these procedural steps, as we understand Interior and CEA have done, there has been proper compliance with the law as it has developed in the D.C. Circuit Court.

### I. Procedure

We understand that each of the following procedural steps has now been implemented:

(1) The CEA staff has compiled a record of all the oral and written communications with private persons interested in the proposed rules. This catalog outlines the content of all the communications as accurately and fully as possible. For the sake of completeness, it also includes recollections of CEA conversations with other executive branch agencies.

(2) Following receipt and review of this material, OSM made it available to the public in the document room at the Department of the Interior. At the same time OSM published a statement in the *Federal Register* of January 4, 1979, acknowledging and explaining the reason for this addition to the administrative record. The statement also announced the reopening of the record to allow comments on factual material contained in the submission. A period of 18 days will be permitted in which appropriate comments may be submitted by the public. At the close of that period OSM will review and analyze these comments. To assure the widest public availability of the CEA documents, copies of the complete packet have been delivered to every Regional Office of your Department. An effort was also made to contact directly State governments likely to have an interest in reviewing this material.

(3) Once the compilation was made publicly available and the notice was forwarded to the *Federal Register* for publication, the CEA Chairman and/or his staff conferred with OSM on particular portions of the proposed rules. First meeting was

22

in January 1979, and there have been a few brief subsequent communications.

(4) Although no changes were made in the proposed rules as a result of these consultations, if any communications made during this consultation process did become in part the basis for the Secretary's final decision concerning the rulemaking, their relationship to that decision would be fully spelled out with the promulgation of the final rule. The record may not be further reopened prior to the final decision unless you propose to rely on information not included in the record and subjected to reasonable public comment in advance of your final decision.

(5) During the period of consultation, the participants were asked to refrain from communicating with other persons interested in the rulemaking, including other executive branch officials, if those officials have either directly or indirectly had contacts with non-Government persons having an interest in the rulemaking.

## II. Participation by CEA in the Decisionmaking Process

The first question is whether either the Constitution or relevant statutes prevent the President's economic advisers from conferring with you. The basic constitutional presumption favors communication and consultation within the executive branch in the process of formulating rules and procedures. While some matters may be of quasi-adjudicatory nature, to which communication with the decisionmaker would seem improper, in the much larger category of executive actions barriers to free communication between and among the President's advisers should not be lightly assumed. The President is charged under Article II, section 3, of the Constitution to insure that the laws are faithfully executed. In *Myers* v. *United States*, 272 U.S. 52, 135 (1926), the Supreme Court stated:

The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the constitution evidently contemplated in vesting general executive power in the President alone. Laws are often passed with specific provision for the adoption of regulations by a department or bureau head to make the law workable and effective. The ability and judgment manifested by the official thus empowered, as well as his energy and stimulation of his subordinates, are subjects which the President must consider and supervise in his administrative control.[1]

---

[1] We note that other language in *Myers* makes unclear whether the mode of supervision contemplated by the Court in the language quoted in the text above was limited to the power of removal or whether that supervision could take less drastic forms, such as consultation. *See* 272 U.S. at 135.

We believe that, albeit dictum, this language is a correct statement of the principle that Congress, in delegating rulemaking authority to department heads, who are subject to the President's removal power under Article II, section 2, class 2, of the Constitution, must be assumed to have recognized the inherent power of the President to supervise the exercise of that authority. We also believe that this supervisory power of the President, and the duty of the department heads to report to the President concerning the discharge of their offices,[2] carry with it the constitutional right of the President to receive and give advice to his subordinates relating to the discharge of their duties. *See, e.g., United States* v. *Nixon*, 418 U.S. 683 (1974).

The only substantial issue is, in our view, whether Congress has attempted, by statute, to limit or otherwise regulate participation (in the decisionmaking process) by the Chairman or any other Federal official not within Interior. We think the answer to this question is an unqualified negative.

Before discussing those statutes that could arguably place some limits on the Chairman's participation, we would observe that Congress has demonstrated a full awareness of the means by which it may attempt to regulate interagency review of proposed rules. For example, in § 305(a) of the Clean Air Act Amendments of 1977, 42 U.S.C. § 2607(d)(4)(B)(ii), Congress specifically required that written comments by agencies participating in interagency review of rules be placed on the record of the rulemaking conducted by the Administrator of the Environmental Protection Agency. That provision also recognizes that such written comments may be made at any point in the process, both prior to the publication of the notice of rulemaking and after the close of the public comment period.

It is particularly significant that neither the language of 305(a) nor its legislative history suggests in any way that Congress was enlarging, or needed to enlarge, an affirmative power of the President to conduct such interagency review.[3] Furthermore, we believe that Congress' refusal to extend the requirement of § 305(a) to oral communications was a recognition of the right of the President and his subordinates to communicate in confidence their views on issues raised by rulemaking governed by that provision.

The question whether the relevant statutes, here § 4 of the Administrative Procedure Act, 5 U.S.C. § 553, and § 501 of the 1977 Act, 30 U.S.C. § 1251, in any way limit the authority to conduct interagency review of the rule at issue may be disposed of readily. Nothing in the language of the statutes or their legislative history suggests an intent to limit or otherwise to regulate the interagency review that has been accorded this rule. Furthermore, we believe that the Supreme Court's recent decision in *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense*

---

[2] Constitution of the United States, Art. II, § 2, cl. 1.
[3] *See* H. Rept. 294, 95th Cong., 1st sess., 319-20 (1977); H. Rept. 564, 95th Cong., 1st sess., 177-78 (1977).

*Council, Inc.*, 435 U.S. 519, 547 (1978), indicates that § 553 is an affirmative grant of power to agencies to devise procedures most congenial to the rulemaking conducted by them. Thus, we think it clear that a procedure adopted by an agency to secure the views of other interested agencies on specific rules is within the ambit of the power conferred by § 553. We therefore turn to the question whether the procedures set forth in part I above are a reasonable exercise of that power.[4]

### III. The D.C. Circuit Court Cases

In two cases, *Home Box Office, Inc.* v. *FCC*, 567 F. (2d) 9 (D.C. Cir. 1977), cert. denied, 434 U.S. 829 (1977), and *U.S. Lines, Inc.* v. *Federal Maritime Commission*, 584 F. (2d) 519 (D.C. Cir. 1978), panels of the D.C. Circuit Court of Appeals have indicated that so-called *ex parte* communications between persons interested in an "informal" rulemaking and the rulemaking agency must be generally disclosed on the record. Those cases also indicate that, at least where such contracts may have substantially influenced or provided a basis for the rule finally adopted, their substance must have been subjected to adversary comment by other interested persons.

Although the Supreme Court's decision in *Vermont Yankee*, as well as decisions by other panels of the D.C. Circuit Court,[5] cast considerable doubt on the correctness and applicability of these court-fashioned *ex parte* rules in the present context, we believe that the procedures in Part I satisfy *Home Box Office* and *U.S. Lines*. The procedures were drafted with these two cases in mind and they reflect our best efforts to satisfy the several requirements of the cases. First, they place in the administrative record the substance of all so-called *ex parte* communications between private persons and the Chairman and his staff since the notice of proposed rulemaking was published. Every document that CEA received and reviewed has been transmitted to OSM and the substantive details of every telephone conversation have been disclosed. Thus, in our view, there is no longer any reasonable likelihood that in meeting and discussing the proposed rules CEA will be transmitting any off-the-record *ex parte* information. Secondly, the procedures devised here give to any interested person the right to comment on those communications for a reasonable period

---

[4] We are advised that no departmental regulations in effect from September 18, 1978 to the present would in any way conflict with the procedures set forth in Part I. On August 10, 1978, a document entitled "Public Participation in Decisionmaking—Interim Guidelines and Invitation for Comment," was published in the *Federal Register*, 43 F.R. 35754–57, outlining your proposed policy regarding public participation in rulemaking. Nothing in those guidelines appears to be inconsistent with the procedures set forth in Part I. Nor would this procedure appear to conflict with the notice of procedures for public participation issued by your Department on June 12, 1978, establishing the policy for public participation at the pre-notice state of this rule, 43 F.R. 25881–82 (June 15, 1978), or the proposal of the rule itself, 43 F.R. 41661 *et seq.* (Sept. 18, 1978).

[5] *See, Action for Children's Television* v. *FCC*, 564 F. (2d) 458 (D.C. Cir. 1977); *Hercules, Inc.* v. *EPA*, 598 F. (2d) 91 (1978).

of time. The reopening of the record for this limited purpose has been undertaken to insure that any information communicated by CEA that was made a part of the record has been subjected to the fullest and fairest scrutiny.[6] In fact, we have been advised both by CEA and by OSM staff that the predominance of material released was already in the record developed during the comment period. Indeed, most of the information, insofar as CEA found it to be relevant, was included in the RARG Report which, as you know, was incorporated into the record during the comment period and was itself subjected to considerable public scrutiny.

The only question that remains under *Home Box Office* and *U.S Lines* is whether those cases require that the meetings and communications between your staff and CEA must themselves be placed in the public record. Neither case dealt with intra-executive branch communications; in both the *ex parte* contacts were made by interested persons outside the decision-making process. Moreover, we think the purposes underlying the holdings in these cases are fully served by a requirement that all contacts with persons outside the Government be disclosed. It was not the purpose of the court to alter the ordinary way in which decisions are made by those charged with promulgating rules. Just as there is no bar in those opinions against confidential consultation between the Secretary and his assistants, we find no bar to communications from others within the executive branch so long, of course, as the communications are not the vehicle for the indirect transmission of off-the-record, *ex parte* information from interested persons outside the Government. For the reasons outlined in our discussion of the role of the Chief Executive in overseeing the rulemaking process, we would be most reluctant to infer a prohibition or other restraint against a full exchange of views among the President's advisers. To the contrary, Congress has frequently demonstrated sensitivity to the need to preserve open lines of communication for the exchange of views and to improve the deliberative process within the executive branch. Exemption (b)(5) in the Freedom of Information Act, 5 U.S.C. § 552 (b)(5), stands as the clearest evidence of Congress' continuing acknowledgment of the practice of confidential communications.

Finally, we should reiterate that to permit confidential communications

---

[6] Reopening the record for the restricted purpose of allowing comment on the CEA disclosure document is somehow unfair to other interested persons who might wish to make additional comments after the 60-day formal comment period closed. Indeed, we understand that a number of comments have been received by OSM after the close of the comment period but that it has declined to review and consider them. We believe that a limited reopening is appropriate in this case. The purpose of the reopening is quite simply to assure closest compliance with these D.C. Circuit Court decisions while allowing executive branch officials to fulfill their responsibilities. As the disclosure documents prepared by CEA demonstrate, this procedure was not intended to provide, nor will it have the effect of providing, a means of funnelling tardy industry or other interested persons' comments to the agency decision-maker. Virtually all the comments received by CEA were made during the public comment period and are already in the record. Given these facts, we think it reasonable to reopen without launching anew the rulemaking process.

between Interior and the President's economic advisers will not frustrate the basic requirements of the Administrative Procedure Act and of the 1977 Surface Mining Act that the foundation and rationale for ultimate rule-making determinations be spelled out and be subject to close public and judicial scrutiny. To whatever extent your views are premised upon economic or other considerations arising in the course of your discussions with CEA, those considerations must (1) have their origin somewhere in the record you have developed over the last few months, and (2) be articulated in your final rule. These requirements having been met, and the other procedures satisfied, we see no substantial basis for a claim that the rules themselves are arbitrary or capricious, or that the rulemaking process has been otherwise flawed.

LARRY A. HAMMOND
*Acting Assistant Attorney General*
*Office of Legal Counsel*

Attachment

Mr. Peter G. Gould
Special Assistant to the Chairman
Council of Economic Advisers
Executive Office Building
Washington, D.C. 20506

Dear Peter:

This letter is to confirm the conversations we have had over the last several days with respect to the Council of Economic Advisers' (CEA's) participation in the Office of Surface Mining's (OSM's) regulations. The following items have been discussed fully with Leo Krulitz and, more recently, with Bill Eichbaum, at the Department of Interior. We have also reviewed this matter carefully with Jim Moorman and his staff in our Land and Natural Resources Division. It is our view that the following procedures are fully compatible with the relevant statutes and case law with respect to the informal rulemaking process:

(1) CEA staff members are in the process of preparing a catalogue of all oral and written communications they may have had with parties interested in OSM's proposed strip mining regulations. It is understood that the compilation of these contacts will reflect, as completely as reasonably possible, the content of all such communications. This Office will assist you in assuring that this material is set forth in as complete and accurate a form as reasonably possible. Hopefully, we will be able to transmit this material to OSM on Tuesday morning, January 2, 1979.

(2) Knowledgeable people at OSM will review this compilation as soon as it is received and will ascertain what portions, if any, of the material constitute new matter not already set forth on the record of this rulemaking proceeding. Of course, staff people at CEA should be able materially to assist in this process, since you also have a comprehensive knowledge of the record.

(3) As soon as reasonably possible following the receipt and review of this material, OSM will make it available to the public in the document room at the Department of the Interior. At the same time OSM will have published in the Federal Register a

statement acknowledging and explaining the reason for the supplementation of the record in this respect. The statement will also announce the reopening of the record to allow comments on whatever new factual material may be contained in this submission. A period of ten days will be permitted in which appropriate comments may be submitted by interested parties. At the close of that comment period OSM will review and analyze these comments in the same manner in which it has in the past analyzed comments accumulated during the public notice and comment period.

(4) It is the judgment of this Office that once this compilation of third-party communications has been made publicly available and the notice has been transmitted to the Federal Register for publication it will then be appropriate for the Chairman and staff personnel at CEA to participate in the decisionmaking process in whatever fashion is most productive. We understand that you envision one or more meetings to discuss particular portions of the proposed rules. Those meetings need not be conducted on the record. I have advised, however, that you maintain a record of the agenda items discussed with OSM so that, if necessary, we can identify at a later time those portions of the regulations that were the subject of your communications.

(5) To the extent that your meetings and communications become in part the basis for the Secretary of Interior's final decision, of course, the substantive basis for that decision will be spelled out on the record. It will not be necessary for the Secretary to allow any additional reopening of the record at this later stage unless, through some failing in the procedure we have developed, the Secretary's ultimate judgment is based indirectly on third-party communications that were not included in the record and subjected to reasonable comment.

(6) During this period of consultation between CEA and OSM the Chairman and CEA staff members will refrain from having any further communications with parties interested in these proposed regulations. In order most carefully to assure the propriety of this process we have also advised you to refrain from having communications with other executive branch officials if those officials have, themselves, had contacts with outside parties with respect to these regulations.

As I have stated above, it is our view that these several steps carefully pursued will assure the legality of the informal rulemaking proceeding. We have begun the drafting of and will complete early next week a legal opinion discussing the several bases for this conclusion.

Sincerely,

LARRY A. HAMMOND
*Acting Assistant Attorney General*
*Office of Legal Counsel*

cc: Mr. William Eichbaum
    Office of the Solicitor
    Department of the Interior